J. D. MARTIN, Appellee, v. LUTHER GORMLY, Appellant.

**TRIAL:** Instructions—Objections—Waiver. The objection that instructions are oral instead of in writing is waived by failure to object when the instructions are given. (Sec. 3705-a, Code Supp., 1913.)

**EXCHANGE OF PROPERTY:** Rescission—Failure to Furnish Consideration Contracted For. Howsoever trifling may be the consideration for which one has contracted, even in a trade "unsight and unseen," he is entitled to rescind in case such consideration is withheld.

*Appeal from Washington District Court.*—HENRY SILWOLD, Judge.

WEDNESDAY, MARCH 14, 1917.

ACTION to recover damages for defendant's failure to comply with an agreement to exchange certain lands in Kansas for some personal property, and money which plaintiff delivered and paid to the defendant. Defendant's answer

was a general denial, and a plea that he never agreed to give plaintiff a deed to Kansas land, and that, while he received certain property from plaintiff, it was practically worthless, and that all defendant undertook to do was turn plaintiff over to one Fletcher, Fletcher being authorized by the agreement to subrogate plaintiff to the rights which he (defendant) had, if any, to the Kansas land. Upon the issues joined, the case was tried to a jury, resulting in a verdict for plaintiff in the sum of $200. Plaintiff remitted all of this verdict in excess of $180, and judgment was entered for this latter amount. Defendant appeals.—*Affirmed.*

*Brookhart Bros.,* for appellant.

*Eicher & Livingston,* for appellee.

DEEMER, J.—I. Defendant's counsel say that the transaction between the parties hereto was a sort of "unsight and unseen" deal, in which each took his chances, and that plaintiff has nothing to complain of, although he never got even a paper title to the Kansas property. The trial court did not adopt this view, although it inferentially directed a verdict for plaintiff, leaving to the jury but the single question of the amount of plaintiff's recovery.

**1. TRIAL: instructions: objections: waiver.** In the first place, it is said that the instructions of the court were oral, when, under the statute (Section 3705, Code, 1897), they should have been in writing; and, again, they say that the verdict, even as rendered, is excessive, and should have been set aside.

The record does not show that the instructions were oral, and, even if it did, no objection or exception to that form of instruction was made, and the motion for a new trial is not bottomed upon that ground. In these circumstances, defendant is not entitled to complain. *Head & Metzger v. Langworthy,* 15 Iowa 235; Sec. 3705-a, Code

Supp., 1913. The verdict as finally reduced to $180 has support in the testimony. Plaintiff gave defendant two bulls, one stallion and a note for $50. Treating the note as cash, and adding interest thereto down to the time of trial, and taking the testimony as to the value of the personal property in its most favorable light for plaintiff, the property was worth $125. This, added to the amount of the note, and to this interest, would justify a verdict for the amount of the judgment.

2. EXCHANGE OF PROPERTY: rescission: failure to furnish consideration contracted for.

II. The main question in the case arises over the contention that plaintiff is not entitled to recover anything, and that, in any event, the question was for a jury. Defendant testified as follows regarding the trade:

"As near as I can state the conversation, Mr. Martin and I had done quite a little trading together, and I saw him in Crawfordsville one day, and I believe I asked him what he had to trade, and he told me right off the bat what he had. I told him that I was supposed to have 80 acres of land in Kansas, somewhere down there, and if I had I would trade it to him. I said to him, 'Jim, I have got no need for this land and I don't know whether I own it or not. I never saw it, and I know nothing about it.' I told him that Fletcher had told me he had a warranty deed for it, and that he would give me a warranty deed for my half any time I wanted it, and if I was to trade it off he would either turn the deed to me or to whoever I traded it, and I told Mr. Martin that before any trade was made he would have to go and see Mr. Fletcher and find out about this, and if he was satisfied he would come back, and we would make the deal. In two or three days or a week after, when I was in town, he came along and said he had seen Fletcher, and Fletcher said it was all right; that he would give a deed for it if we wanted to trade; and I said, 'Then you get

your deed from Fletcher, for I don't know anything about it. I don't know whether I have got any land, and I don't know what kind it is.' He said he would take Fletcher's word for it; that they had been pretty good friends, and he would take his chances on getting it. I said, 'All right, we will just make the trade then;' and did make the trade right there. I did not see the stuff he traded me before I got it, except the horse, which I had seen sometime before, probably six months, but I had never seen the bulls. At the time I saw the horse, he was not blind. In two or three days after the trade, I went down to Martin's and we were talking about the trade, and I said, 'Jim, I came down after the horse and stuff,' and said, 'Where is the horse?' We were standing in the barn, and he replied that the horse near us was the one. I said I would never take him home if I could get out of it; so I just left it there with Jim and came back to town. I believe the first man I met was John Jerrall. I asked him what he would give for the horse, and he said he would give $10, and I sold the horse to him for $10. I kept the bulls for probably a month and then sold them both. I sold one of them, the biggest one, for 5c a pound. I think he came to $40 and a few cents. He weighed about 800 pounds. The other one brought $35. Q. You cashed the note, didn't you? A. You bet. Q. You got the money? A. You bet. Q. That is, $50? A. Yes, sir. Q. And you have never tendered anything you got back to him, Martin? A. Sure, I did. Q. You tendered him back the money? A. He came around and wanted to fix it up some way or the other. I didn't tender him all of it; I don't know just exactly how I expressed it, but I says, 'Jim, I don't think I owe you a cent.' I says, 'You didn't rely on me for that. I didn't have nothing to trade you, and told you I didn't, in my name, but,' I says, 'rather than to have any fuss about it, I am willing to pay you something.' Q. Now Clint Fletcher came and offered

to turn back what he got from you when you made the trade? A. Well, he said I could get it back if I wanted it. Q. And you went with Martin and asked Fletcher, and says, 'Clint, I want you to deed my part of that to him?' A. I don't remember of talking to them there. I might have said something to them; I couldn't say about that. Q. And you guaranteed to him that you would see that he got a deed? A. I didn't do no such thing. Q. Either from you or from Clint? A. I did not. I don't know anything about the title to the real estate. I paid some taxes—I don't know where they went to. I gave it to Clint. Q. You have got the deeds? A. I have got something there with the name scratched off, but I never seen it for 4 or 5 or 6 years after it was made. Q. Will you give Jim Martin a warranty deed for 80 acres of that land, an undivided half of the 160 acres of land? A. How in the thunder can I do it, when I haven't got any? Q. You have got the deeds? A. I have got something there with the name scratched off, but I never seen it for 4 or 5 or 6 years after it was made. (By court) Q. Who owned the land for which this deed was taken by the other man? A. God knows, I don't. Q. Did you and he own it together? A. Fletcher? Q. Yes. A. We was supposed to own it together. * * * I do not know who owned the land for which this deed was taken by the other man. Fletcher and I were supposed to own it together."

At this point, both parties rested, and the court gave the defendant the opportunity of making plaintiff a deed to the land in question, and the defendant refused; and then the court, on his own motion, instructed the jury as follows:

"Gentlemen of the jury: The court, on his own motion, directs you to return a verdict for the plaintiff, and the only work you will have to do is to retire to the jury room and figure out the amount. The defendant excepts."

The title to the land was in Fletcher, and Fletcher agreed to convey defendant's interest therein to the plaintiff; but when the time came to make the deed, he refused, because he thought he had no right to convey, and, instead, conveyed the same to defendant Gormly. Gormly held a paper title, or deed, down to the time of trial, and then refused to make any deed thereto to plaintiff. It is quite certain that, no matter what the exact nature of this trade, plaintiff was to get a deed or conveyance of some kind, taking his chances in the title, either from Fletcher or from Gormly. The title was to come from Fletcher, because whatever record there was, showed that the title was in him, and he agreed to make a conveyance to plaintiff. As he did not do so, but conveyed to Gormly, he (Gormly) was as much under obligation to make the deed as was Fletcher; for his title came with notice and knowledge of the agreement, and he was also obligated under the contract to give or see that plaintiff was given something. That something may have been of little, or perhaps no, appreciable value; but it was the consideration for the transfer of plaintiff's property, and plaintiff is entitled to the performance of the contract on defendant's part, no matter how little value there may have been to him in it. As to that, he had a right to speculate, and, if defendant refused to comply, plaintiff had the right under this record to recover the value of his property. Even in trades "unsight and unseen," the parties are entitled to something. They may be willing to speculate on its value, but they are entitled to receive property or the representative thereof in some form. They were not, of course, to make warranties, but each party was entitled to and must receive something from the other. Here, so far as the defendant is concerned, it was a deed or instrument of transfer to whatever claim he (defendant) had in the Kansas land. This he never got, and defendant finally refused to give it to him. In such event, he received

something for nothing, and must return what he received or the value thereof. Of course, such a contract might have been made as the defendant claims, without assuming any personal liability on his part; but where one assumes to have a right to transfer an interest in land, save that the title is in another, and he gives his consent to that other to make the transfer, and the other agrees to do it, but afterward fails and refuses to do so, and conveys to the defendant, it is clear that the defendant must see to it that a deed is made which will convey whatever interest he may have in the land, on penalty of refunding what he received. The trial court so held, and there was no error.

The judgment must be, and it is,—*Affirmed.*

The foregoing opinion was prepared by Justice Deemer, now deceased, and is adopted as the opinion of the court.

GAYNOR, C. J., LADD, EVANS and PRESTON, JJ., concur.